**KENTUCKY LEAGUE OF CITIES, INC., et al. Plaintiffs**

v.

**GENERAL REINSURANCE CORPORATION**
**Defendant**

**No. 3:99CV–499–H.**

United States District Court, W.D. Kentucky. at Louisville.

Oct. 31, 2001.

Walter M. Jones, A. Michelle Turner, Michelle DeAnn Wyrick, Wyatt, Tarrant & Combs, Louisville, KY, D. Barry Stilz, Kinkead & Stilz, Lexington, KY, for Plaintiffs.

Raymond G. Smith, Boehl, Stopher & Graves, Louisville, KY, Damon N. Vocke, Lord, Bissell & Brook, Chicago, IL, for Defendant.

## MEMORANDUM OPINION

HEYBURN, District Judge.

The Court now considers the parties' cross-motions for partial summary judgment. Plaintiff, Kentucky League of Cities, Inc. ("KLC"), is the successor in interest to a self-insurance fund that provided workers' compensation insurance to a group of cities and counties ("KACo–KML") as allowed in KRS § 342.350.[1] De-

---

1. Plaintiff is a successor to the Kentucky League of Cities ("KLC"), a non-profit association of cities. Along with the Kentucky Association of Counties ("KACo"), KLC formed a

Self–Insured Workers' Compensation Fund, the KACo–KML Self Insured Workers' Compensation Fund. KACo–KML ceased issuing new workers' compensation policies on July

fendant, General Reinsurance Corporation ("GenRe"), a Delaware corporation, sold an insurance policy to KACo–KML providing "aggregate excess" insurance for the years 1986 and 1987 (the "Policy").[2] Plaintiff claims that the Policy violated Kentucky law because it was issued on a "claims paid" rather than a "claims incurred" basis. KACo–KML has paid all the workers' claims. This case concerns whether GenRe should reimburse some of these payments. Plaintiff seeks: (1) to conform the Policy under terms complying with Kentucky law; (2) to reform the Policy based on a mutual mistake of fact; and (3) breach of contract. The present motions concern only Plaintiff's claim for conformation of the Policy. The Court has had the benefit of excellent memoranda and extensive oral argument on these complex and unique issues.

## I.

Kentucky law requires every employer in the Commonwealth to insure its workers' compensation liabilities. *See* KRS § 342.340. Most employers do so by purchasing a conventional workers' compensation insurance policy. However, employers do have an alternative. The Kentucky Workers' Compensation Board (the "Board") may authorize a group of "employers to enter into agreements to pool their liabilities . . . for the purpose of qualifying as self-insurers." KRS § 342.350(4).[3] The statute says only that such "employers securing certification as group self-insurers are regulated by the rules and regulations drawn by the workers' compensation board and are not to be in any way subject to the provisions of [other] subsections . . . of this section . . . ." *Id.*

As provided by statute, the Board promulgated regulations "establishing minimum requirements through which groups of employers may join together to self-insure their workers compensation liability." 803 KAR 25:025, *et seq.* (1987).[4] Un-

1, 1993, but continued to pay claims, presumably as required by the Workers' Compensation Board under its regulatory authority. The assets and liabilities of KACo–KML were divided with KACo assuming responsibility for the counties' portion and KLC assuming the cities' portion. Under this agreement, KLC assumed responsibility for reimbursement of payments made in excess of the aggregate retained liability of KACo–KML under excess policies issued by insurers to KACo–KML.

2. The Policy had an initial term of July 1, 1986 to June 30, 1987, and was renewed for a second year with similar terms. The Policy provided coverage up to $2,000,000 in 1986 and up to $2,150,000 in 1987 for all compensation awards paid by KACo–KML to injured workers in a twelve month period greater than either 50% of the annual premiums KACo–KML collected from its members, or $2,000,000. KACo–KML paid premiums in the approximate amount of $385,000 and $346,000 respectively for the Policy in 1986 and 1987. According to Defendant, about $140,000 of each premium year is attributable to the aggregate excess coverage.

3. The Kentucky Workers' Compensation Board is a statutory body whose members are appointed by the governor and who are charged with the responsibility of administering the workers' compensation system.

4. The Board first established regulations in 1977, after the passage of KRS § 342.350 in 1976. The Court concerns itself only with those regulations in effect during 1986 and 1987. The regulations for those years appear identical for our purposes and also appear unchanged from previous years' regulations. The pertinent parts of 803 KAR 25:025, *et seq.* state:

> NECESSITY AND FUNCTION: This regulation establishes the procedure and minimum requirements through which groups of employers may join together to self-insure their workers' compensation liability. Section 1. Definitions . . . .
> (6) "Aggregate excess insurance" means an insurance policy which covers statutory claims in excess of a certain percentage of the normal premium subject to a maximum dollar amount.

derstanding the certification and operation of self-insured funds requires an explanation of the complex interrelationship between myriad regulatory provisions, most of which feature insurance industry terms of art.

The central concept to understand is the "self-insurance fund." The regulations define the fund as comprised of the "loss fund," together with all other expenses related to the self-insurance program, including, *inter alia*, the cost of "aggregate and specific excess insurance." *Id.* at § 1(9). The "loss fund" is "the amount of total retained liability for claims by the group members as set forth in the aggregate excess insurance policy," which is determined annually. *Id.* at § 1(8). Stated

> (7) "Specific excess insurance" means an insurance policy which covers the amount of any claim from any one (1) occurrence involving one (1) or more employees in the same accident or occurrence in excess of a specified dollar amount subject to a maximum dollar amount.
>
> (8) "Loss fund" means the amount of the total retained liability for claims by the group members as set forth in the aggregate excess insurance policy.
>
> (9) "Self-insurance fund" means the loss fund together with all other expenses of the group related to the self-insurance program, including aggregate and specific excess insurance, servicing organization fees, bonds, related taxes and other reasonable and necessary expenses.
>
> (10) "Assessments" means charges to group members to sustain the self-insurance fund.
>
> * * * * * *
>
> (13) "Trustees" means persons to be elected by the group members and/or selected by the board of directors of the association for stated terms to direct the administration of the self-insurance fund.
>
> * * * * * *
>
> Section 2. Requirements for Group Self-Insurance. (1) A group of employers must file an application and an indemnity agreement in the form prescribed by the board to become group self-insurers. Such application must be filed not later than thirty (30) days prior to the proposed inception date of the self-insurance program. The indemnity agreement shall jointly and severally bind the group and each member thereof to comply with the provisions of the Kentucky Workers' Compensation Act, the rules and regulations of the board, and the decision of the trustees for operation of the group fund.
>
> * * * * * *
>
> Section 4. Withdrawals.
>
> (2) Entire group. Should a group determine to withdraw from its self-insurance program.... [I]t must also show the board that it has made satisfactory arrangements for the continued payment and servicing of all outstanding claims.
>
> Section 5. Trustees; Duties....
>
> (4) Excess insurance.
>
> (a) The trustees must purchase aggregate excess insurance for losses in excess of a percentage of the normal premium which shall be the retained liability of the group members. That retained liability and other fixed costs of the fund must not exceed 100 percent of the assessment of the group members, unless such amount over 100 percent is secured by unencumbered surplus monies of the group fund. The limit of liability of the aggregate excess insurance shall not be less than $1,000,000 or fifty (50) percent of the normal premium, whichever is higher.
>
> (b) The trustees shall purchase specific excess insurance with a limit of at least $1,000,000 per occurrence.
>
> * * * * * *
>
> (5) Fund balances.
>
> (a) Not less than thirty (30) days prior to inception of each self-insurance year, the trustees must collect from its group members an amount equal to not less than twenty-five percent of the anticipated self-insurance fund for the ensuing year and must collect not less than one-third (⅓) of the remaining balance each thirty (30) days thereafter. The amount to be collected shall be based upon estimated annual assessments and shall be adjusted each year accordingly. The assessment to each member shall bear a relationship to the normal premium chargeable to that member.

more simply, the "loss fund" is the projected total claims liability for the coming year. Sometimes this is also referred to as the retained liability. *See id.* at § 1(8) and § 5(4)(a). Each year, in order to receive Board certification, the trustees must estimate and then assess premiums sufficient to cover all projected claims and expenses. These premiums create and fund the "self-insurance fund." *Id.* at § 5(5)(a). The possibility exists, of course, that the actual claims could exceed the projected "loss fund" for that year. Therefore, the trustees must purchase excess insurance to cover claims which exceed the amount available in the loss fund for that year. *See id.* at § 5(4)(a). Additional protections exist because employers may be individually liable for claims and the Board may require additional coverage when a group disbands. *See id.* at § 2(1) and § 4.

The regulations specify two forms of excess insurance, "specific" and "aggregate." "Aggregate excess insurance," the type at the center of this controversy, "means an insurance policy which covers statutory claims in excess of a certain percentage of the normal premium subject to a maximum dollar amount." *Id.* at § 1(6). The regulations describe the precise scope of aggregate excess insurance which the fund's trustees must purchase. *See id.* at § 5(4)(a). The self-insurance fund cannot exceed 100 percent of the "assessment[s]," or "charges to group members to sustain the self-insurance fund." *Id.* at § 5(4)(a)

and § 1(10). And, the liability of an aggregate excess insurance policy is capped at a certain figure, but this ceiling cannot be less than $1,000,000 or 50% of the normal premium, whichever is higher. *See id.* at § 5(4)(a).

In accord with these regulations, KACo–KML first attained certification as a self-insured fund in 1978. This controversy arises from KACo–KML's 1986 purchase of the GenRe Policy for aggregate excess insurance. The Policy provided coverage only for claims both filed and paid within the policy year, subject to the aggregate excess limitation.[5] A "claims incurred" policy, which Plaintiff says the regulations require, would cover all claims originating during the policy year, regardless of when those claims are paid, subject to the aggregate excess limitation. At issue is not whether the claims actually paid in 1986 and 1987 exceeded the self-insurance fund.[6] KACo–KML says that due to the Policy, it was without coverage for excess claims that originated in 1986 and 1987, but were not paid until certain future years. Thus, the practical consequence of Plaintiff's argument is that GenRe should be liable for claims in those years after 1987 where KACo–KML's annual claims exceeded the self-insurance fund and where those claims were not otherwise insured by aggregate excess insurance purchased for that policy year.

## II.

In its reply memorandum, KACo–KML argues strenuously that a United States

---

**5.** Both parties agree on this coverage description requiring that claims be "made and paid" in the policy year. The pertinent language of the Policy states:

CLAMS PAID AGGREGATE

Subject to a limit of indemnity of $2,000,000 the Insurer will indemnify the Insured for the amounts actually paid by the Insured during the period July 1, 1986 to June 30, 1987 in excess of fifty percent

(50%) of KACo–KML Premium or $2,000,000 whichever is higher for LOSS SUSTAINED and CLAIM EXPENSES PAID during the period July 1, 1986 to June 30, 1987 under this policy . . . .

**6.** Apparently, GenRe paid no claims under the Policy (in either year) and the aggregate amount of KACo–KML's excess insurance claims in 1986 and 1987 did not exceed its self-insurance fund.

Bankruptcy Court ruling from the Eastern District of Kentucky is binding as to Gen-Re by virtue of collateral estoppel. *See Gen. Reinsurance Corp. v. Kentucky Coal Producers Self–Ins. Fund,* Case No. 95–50021, Adv. No. 95–5018 (E.D.Ky. Aug. 26, 1996). In that case, Judge Joseph Lee considered a similar GenRe aggregate excess insurance policy and concluded that the 1986 and 1987 regulations required self-insurers to carry claims incurred excess coverage. In a brief oral ruling without any discussion of its reasoning, the Bankruptcy Court granted partial summary judgment against GenRe, conforming the aggregate excess insurance policy from a claims paid to claims incurred basis.[7] The court expressly left open the issue of damages owed by GenRe, pending resolution of two questions: whether conformation required the self-insurers to pay additional premiums and/or a higher deductible, and encouraging the parties to reach an agreed settlement on those issues.[8] Indeed, the parties settled the case without further adjudication or appeal.

■ In a diversity case federal law governs procedural issues, such as collateral estoppel. *See Losey v. N. Am. Philips Consumer Electronics Corp.,* 792 F.2d 58, 61 (6th Cir.1986); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Collateral estoppel, or issue preclusion, provides that "once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza,* 464 U.S. 154, 158, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). The doctrine "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

Recognizing these benefits, the Supreme Court has in recent years expanded the scope of the doctrine. The Court has abandoned the requirement of mutuality of parties; i.e., one party may use a prior judgment against the other party even if both parties were not bound by the judgment. *See Blonder–Tongue Lab., Inc. v. Univ. of Illinois Found.,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Then, the Court conditionally approved the "offensive" use of collateral estoppel; i.e., a plaintiff may foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully. *See Parklane Hosiery,* 439 U.S. at 322, 99 S.Ct. 645. In doing so, however, the Court also emphasized that the offensive use of collateral estoppel is more problematic than defensive use, and thus cautioned against an undisciplined application of the doctrine. *Id.* at 329–331, 99 S.Ct. 645.[9] Ultimately,

---

7. The transcript contains little upon which to rely: no citation to authority establishing Kentucky's standard for when conformation of insurance contracts is appropriate, and no specific reference to which provisions of the statutory scheme mandate claims incurred coverage.

8. This same court later granted summary judgment on identical grounds in favor of plaintiff Kentucky Coal Producers in a separate adversary proceeding against a different defendant. *See Kentucky Coal Producers Self–*

*Ins. Fund v. Safety Nat'l Cas. Corp.,* Case No. 95–50021, Adv. No. 97–5108 (E.D.Ky. May 9, 2001). The aggregate excess insurance policy at issue in that proceeding had been sold by defendant Safety National Casualty Corporation to "provide[ ] a tier or layer of coverage for workers' compensation claims secondary to the primary layer of coverage obtained ... from [GenRe]." *Id.* at 2.

9. Offensive issue preclusion may increase the total volume of litigation; "[s]ince a plaintiff will be able to rely on a previous judgment

the Court "concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied." *Id.* at 331, 99 S.Ct. 645. *United States v. Sandoz Pharmaceuticals Corp.*, 894 F.2d 825, 826 (6th Cir.1990) ("[O]nce it is established that the elements of collateral estoppel are present, a district court has broad discretion to determine when the doctrine should be applied offensively.").

■ In this case, Plaintiff seeks to use the ruling of the Bankruptcy Court in *Kentucky Coal Producers* in a nonmutual, offensive manner. KACo–KML was not itself a party (and thus was not bound) by this prior judgment, but Plaintiff asserts that GenRe is precluded from relitigating an issue on which it has already lost. The Sixth Circuit has established a well known general standard for applying collateral estoppel:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;
>
> (2) determination of the issue must have been necessary to the outcome of the prior proceeding;
>
> (3) the prior proceeding must have resulted in a final judgment on the merits; and
>
> (4) the party against whom estoppel is sought must have had full and fair opportunity to litigate the issue in the prior proceeding.

*Sandoz*, 894 F.2d at 826–27 (quoting *Detroit Police Officers Ass'n. v. Young*, 824 F.2d 512, 515 (6th Cir.1987)). There is no dispute that *Kentucky Coal Producers* satisfies most of these elements, but it is the third prong of the standard—the requirement of a final judgment of the merits—that is sharply contested.

By its own terms, Judge Lee's oral ruling was not final, concluding: "I am leaving those two questions open; the premium assessment question and whether some sort of additional assessment against Kentucky Coal Producers should be required." (Tr. at 3). Judge Lee's grant of partial summary judgment was limited to the issue of whether the contract should be conformed, reserving judgment on the issue of damages. "Such judgments are by their terms interlocutory, see Fed. Rule Civ. Proc. 56(c), and where assessment of damages or awarding of other relief remains to be resolved have never been considered to be 'final' within the meaning of 28 U.S.C. § 1291." *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 744, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976). Judge Lee's order was subject to revision, and neither final nor appealable.

Nevertheless, the Sixth Circuit has upheld the use of collateral estoppel on certain occasions where a judgment was not final and appealable. Plaintiff argues that it would be appropriate for this Court to do so here. In *Birgel v. Bd. of Comm'rs of Butler County, Ohio*, 125 F.3d 948, 951 (6th Cir.1997), the Sixth Circuit stated that "[o]ur Court . . . has applied collateral es-

---

against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable result." *Id.* at 329, 91 S.Ct. 1434. Furthermore, the offensive use of collateral estoppel may be unfair to a defendant, especially if: i) the first action was for nominal

damages, presenting little motivation to vigorously contend the suit; ii) the judgment used for estoppel purposes is itself inconsistent with one or more previous judgments in the defendant's favor; and iii) the second action provides to the defendant advantageous procedural opportunities unavailable in the first action. *See id.* at 330–331, 91 S.Ct. 1434.

toppel even where a final judgment has not been entered." That opinion cited a 1985 Sixth Circuit decision, *Employees Own Federal Credit Union v. City of Defiance*, 752 F.2d 243, where an Ohio state court addressed the merits of the plaintiff's claim and granted the defendant's motion to dismiss. But, before entering its judgment, the trial court allowed the plaintiff time to file an amended complaint. Rather than do so, the plaintiff voluntarily dismissed the action and proceeded to file the same claim in federal court. The Sixth Circuit affirmed the district court's grant of summary judgment to defendants on the ground that the plaintiff was collaterally estopped from relitigating the decision of the state court. *See id.* at 244–45. Finding a lack of Ohio law on point, the court looked to the Restatement (Second) of Judgments § 13, which provides that "for purposes of issue preclusion ... 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." *Id.* at 245. The Court concluded that "the state court issued an opinion with detailed findings of fact and conclusions of law based on pretrial affidavits, depositions, and trial briefs. That decision is 'sufficiently firm to be accorded conclusive effect.'" *Id.* In special circumstances, therefore, the Sixth Circuit seems to approve substitution of detailed findings and authoritative legal conclusions for the usual requirement of a final order.

Some other circuits have come to a similar conclusion. For example, the Third Circuit has likewise held that issue preclusion "does not require the entry of a judgment, final in the sense of being appealable." *In re Brown*, 951 F.2d 564, 569 (3rd Cir.1991). But, also looking to § 13 of the Restatement (Second) of Judgments, the court stated "[i]n determining whether the resolution was sufficiently

firm, the second court should consider whether the parties were fully heard, *whether a reasoned opinion was filed*, and whether that decision could have been, or actually was, appealed." *Id.* (emphasis added). *See also In re Docteroff*, 133 F.3d 210, 216 (3rd Cir.1997) ("Without question, the record establishes that the [first] court adequately considered all the relevant issues. Judge Coughenour wrote a thorough and thoughtful opinion in which he carefully analyzed whether default judgment was an appropriate sanction."); *Greenleaf v. Garlock*, 174 F.3d 352, 358 (3rd Cir.1999) (again noting the Restatement's requirement that the first court "support[ ] its decision with a reasoned opinion").

■ This Court is persuaded that neither these cases nor their reasoning apply well or directly to ours. First, both Sixth Circuit decisions involved the mutual, defensive use of collateral estoppel, which the Supreme Court has recognized as posing fewer risks of unfairness to defendants. Second, and more important, the *Kentucky Coal Producers'* opinion did not contain detailed findings of fact and conclusions of law. This means that the Court does not have a thorough and comprehensive opinion to substitute for the final order requirement. Plaintiff counters that the *Kentucky Coal Producers* case was hard fought, exhaustively argued and that for public policy reasons GenRe should not be allowed to escape the collateral application of the ruling merely because it settled the case. That the case was hard fought applies only to the fourth element of collateral estoppel, which the Court presumes is met.

Quite simply, Plaintiff seeks to ease the requirements of the third element beyond the limits most courts thus far have been willing to go. Many sound reasons sup-

port allowing only a final order to have preclusive effect. Absent other persuasive circumstances, full adjudication is the cornerstone of collateral estoppel. Where related issues are left undecided, the finality and overall-effect of a partial decision is subject to question. To be sure, by settling, parties may escape consequences of an unfavorable order. However, it is just as important that parties not be discouraged from settling unfavorable but disputed decisions due to the possible impact of collateral estoppel. Overall, greater injustice might well arise by loosening the standards for collateral estoppel. In this case, the Court finds no principled manner of exchanging the standard requirement of a final order for an abbreviated and conclusory order.

The Court concludes therefore that Gen-Re is not collaterally estopped from litigating the issue of whether the Policy must be conformed in the current case.

### III.

Irrespective of estoppel, Plaintiff argues that the GenRe Policy must be conformed to comply with Kentucky law. Both the contract's conformation clause [10] and Kentucky case law establish similar standards for conformation. KACo–KML relies on each to assert that conformation is merited in this case. Before considering these arguments, the Court must first discuss the precise standard under Kentucky law for conforming insurance contracts. Then the Court will consider each of the two related arguments which Plaintiff says require conformation of the Policy.

### A.

■ Insurance contracts often include so-called "conformity clauses" which "provide[ ] that clauses which are in conflict with [statutorily mandated coverage] are declared and understood to be amended to conform to such statutes . . . ." 2 *Couch on Insurance* § 19:2 (3d ed.). As *Couch* indicates, conformation requires a predicate finding of a "conflict." Kentucky case law does not reveal an explicit statement of the degree of conflict necessary for conformation. However, most other jurisdictions require a "direct" or "express" conflict between the contract and statutory provisions.[11] The Court believes that Kentucky has applied the same standard. A review of Kentucky cases reveals that conformation of an insurance contract commonly occurs in two circumstances.

The first are those where a statute imposes an affirmative obligation upon an insurance vendor to include a specific provision in its policies. If an insurer sells a policy absent the mandatory provision, a court will nevertheless enforce the provision as though present in the contractual language. The Kentucky Supreme Court has repeatedly recognized the "longstanding rule" that "provisions required by stat-

---

10. The GenRe Policy included the following stipulation: "If terms of this policy conflict with any law applicable to this policy, this statement amends this policy to conform to such law."

11. *See, e.g., Lessard v. Milwaukee Ins. Co.*, 514 N.W.2d 556, 559 (Minn.1994) ("A conformity clause in an insurance policy operates to substitute a statutory provision for a policy provision only where the two provisions are in direct conflict.") (citing *Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 275 (Minn.1985)); *Dye Constr. Co. v. Indus. Comm'n of Colorado*, 678 P.2d 1066, 1069 (Colo.Ct.App.1983) (conformity clause operates only "upon the existence of a statutory provision which is in direct conflict with the provisions of the insurance policy"); *Wesselman v. Travelers Indem. Co.*, 345 A.2d 423, 424 (Del.1975) ("a 'conformity clause' . . . serves to waive or amend a policy limitation clause only where there is an express statutory prohibition" to the contrary).

ute are treated as being a part of the policy the same as if expressly written there." *Philadelphia Indem. Ins. Co. v. Morris,* 990 S.W.2d 621, 626 (Ky.1999) (quoting *Meridian Mutual Ins. Co. v. Siddons,* 451 S.W.2d 831, 833 (Ky.1970)). This is true regardless of whether the policy at issue contains a conformation clause. For example, in *Philadelphia Indem. Ins. Co.,* the Kentucky Supreme Court considered a Kentucky law which included the "express mandate" that an insurance company must pay its own insured for uncompensated damages to the extent of the underinsured motorist policy limit. *Id.* The policy at issue, however, included a provision that any damage awards be reduced or "set off" by the amount of any workers' compensation benefits. *Id.* The Kentucky Supreme Court refused to enforce the set off clause, as "[s]uch a contract provision would contravene the direct language of [the statute] and defeat its purpose of paying uncompensated damages" to the extent of the underinsured motorist policy limit. *Id.* at 627.[12]

The second circumstance is where a statute specifically proscribes certain provisions from inclusion. This principle well-illustrated in the context of statutes of limitations. For example, where a state statute "provides that no insurance company shall issue in this state any policy or contract of insurance containing any provision limiting the time within which an action may be brought to less than the regular period of time prescribed by the statutes of limitation of this state," and the applicable statute of limitations on an insurance contract is five years, a contractual provision imposing a one year statute of limitations must be conformed. *Wulf v. Farm Bureau Ins. Co. of Nebraska,* 190 Neb. 34, 205 N.W.2d 640, 641 (1973). This does not mean, however, that a conformity clause will always defeat a contractual provision circumscribing a statute of limitations period. For instance, an insurance policy may validly set a twelve month period in which to commence an action to recover damages for fire loss under a homeowner's policy, even though the statutory limitations period for which to file suit on a written contract was fifteen years, because "there must be a statute specifically proscribing the contractual shortening of the statutory limitation before there can be a conflict." *Webb v. Kentucky Farm Bureau Ins. Co.,* 577 S.W.2d 17, 18 (Ky.App.1979). "[A]bsent an inhibitive statute[,] contractual limitations were permissible." *Id.* at 19.[13]

---

12. This principle is also supported by a Fourth Circuit case cited by Plaintiff, *Newton v. Employers Liability Assur. Corp.,* 107 F.2d 164 (4th Cir.1939). In this case Virginia law expressly stated "[n]o such policy shall be issued or delivered in this State, to the owner of a motor vehicle, by any corporation or other insurer authorized to do business in this State, unless there shall be contained within such policy [an omnibus coverage clause]." *Id.* at 166. The *Newton* Court found that a conformity clause required the provisions of the statutorily mandated omnibus coverage clause be made a part of an automobile insurance policy that, as written, did not cover persons other than the named assured without the purchase of an endorsement to the policy for an additional premium. *Id.*

13. The Court notes that in the area of uninsured motorist contractual claims, the Kentucky Supreme Court has set forth a less exact standard, holding that insurance companies may contract "with their insureds for a shorter period of time to file a contractual claim" than the fifteen years permitted for general actions on a written contract, but "[s]uch period of time must be 'reasonable' as required under *Elkins,* which required at least two years to file a contractual claim." *Gordon v. Kentucky Farm Bureau Ins. Co. .,* 914 S.W.2d 331, 333 (Ky.1995) (citing *Elkins v. Kentucky Farm Bureau Mutual Ins. Co.,* 844 S.W.2d 423 (Ky.Ct.App.1992)).

In sum, Kentucky courts have conformed an insurance policy primarily where its terms directly conflict with an insurer's statutorily-mandated duty to either include or exclude a certain provision.

### B.

To demonstrate a direct conflict, Plaintiff cites the regulatory amendments promulgated in 1988 as evidence of their true intent in 1987. No one can dispute that the 1988 amendments do redefine aggregate excess insurance to require a claims incurred policy.[14] However, this does not persuade the Court that the 1987 regulations required a claims incurred policy.

Both parties agree that in 1987 Kentucky workers' compensation regulations required a self-insured fund to purchase aggregate excess insurance covering workers' claims that, in the aggregate, exceed the self-insurance fund for that year. Nevertheless, Plaintiff concedes that, on its face 803 KAR § 25:025 does not specifically require a claims incurred policy to meet this requirement. In fact, the 1987 regulations describe an aggregate excess policy not inconsistent with the terms of the GenRe Policy. After all, the liability limit of the GenRe Policy was $2,000,000, or not "less than $1,000,000 or fifty (50) percent of the normal premium, whichever is higher," as required by § 5(4)(a). Moreover, the Board certified KACo–KML as a·self-insured group in part based on its purchase of the GenRe Policy for those years.

Finally, "[a]gency rules typically will not apply retroactively in the absence of an express statutory authorization of retroactive rulemaking." *Orr v. Hawk*, 156 F.3d 651, 653 (6th Cir.1998) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). Here, the 1988 amendment clarifying the definition of "aggregate excess insurance" to mean a policy "written on the basis of claims incurred during the policy period" was not specifically given retroactive application, and therefore does not affect the legality of the Policy sold by GenRe. Granted, "[s]o long as a change in a regulation does not announce a new rule, but rather merely clarifies or codifies an existing policy, that regulation can apply retroactively." *Orr*, 156 F.3d at 654. A valid clarification, however, is most evident where the agency's claimed position has been consistently held. *See Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 698, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) ("the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views") (citing *Bowen*, 488 U.S. at 212–13, 109 S.Ct. 468). No such claim can be made here. Because the Board had previously approved KACo–KML's use of the GenRe Policy, the new regulations marked a change from its former position.

---

**14.** One is a proposed amendment the Board filed on September 1, 1988, that defined "statutory claims" (as used in the definition of "aggregate excess insurance") as "all occurrences taking place within the liability period of the aggregate excess insurance policy for which liability is or may be imposed on an employer under KRS Chapter 342." 15 Ky. Admin. Register 3, at 850. The amendment was accompanied by a "Regulatory Impact Analysis," which stated "the present regulation has been amended to include a definition of 'statutory claims' which has likewise been the past and present policy of the board in interpretation of the words 'statutory claims.'" *Id.* at 853. The other document is the final version of the amendment, published on November 1, 1988, which defined "aggregate excess insurance" as "an insurance policy which covers statutory claims in excess of a certain percentage of the normal premium subject to a maximum dollar amount and is written on the basis of claims incurred during the policy period." 15 Ky. Admin. Register 5, at 1280.

■ The Court finds that: (1) in 1987, the Board regulations required self-insured groups to insure a portion of their liability for the upcoming year and described the general mechanisms to accomplish this; (2) those regulations did not specifically mandate that only claims incurred policies provided compliant aggregate excess insurance, and (3) the new definition for aggregate excess insurance is not retroactive. For these reasons, the Court is completely unpersuaded that GenRe's claims paid policy directly conflicted with any 1987 regulatory provision.

### C.

Plaintiff argues most strenuously that even if specific regulations do not require a claims incurred policy, the spirit and purpose of those regulations does. Its argument proceeds in logical steps. First, KRS § 342.375 (1968) provides that "[e]very policy or contract of workers' compensation under this chapter, issued or delivered in this state, shall cover the entire liability of the employer for compensation to every one of his employees subject to this chapter . . . ." Second, the claims payable in any given year may exceed the total amount of all monies collected (via assessments to the group's members) and set aside in the loss fund for this purpose. Thus, argues Plaintiff, the trustees must purchase aggregate excess insurance sufficient to cover the fund's entire liability in excess of the amount in its loss fund. Claims paid policies, such as the one sold by GenRe, do not accomplish this and therefore violate the spirit and purpose of the regulations.

■ The lynchpin of KACo–KML's argument is that KRS § 342.375 applies to self-insured groups. The Court finds no support for such a premise based on either the legislative history or a logical construction of the statute. The legislature enacted KRS § 342.350 in 1976 specifically authorizing self-insured groups. Pursuant to it the Board promulgated regulations concerning the special circumstances of self-insured groups. These regulations are entirely inconsistent with KRS § 342.375. Most significantly, they do not require insurance for the "entire liability" of a self-insured group as required by KRS § 342.375. Under the self-insured group regulations, the primary layer of claim coverage is retained liability, which cannot conceivably qualify as a "policy or contract of workers' compensation . . . issued or delivered in this state." *Id.* The secondary layer of coverage, aggregate excess insurance, does not—indeed, it cannot—"cover the entire liability of the employer." The Board regulations clearly permit the excess coverage to be limited to $2,000,000. *Id.* at § 5(4)(a). Above that, any responsibility falls back upon the joint and several liability of the self-insured group. *Id.* at § 2(1). Moreover, KRS § 342.375 is a general statute enacted eight years before the legislature more specifically authorized self-insured groups. In this instance, the more specific regulation pursuant to the most recent legislative enactment should prevail. For all these reasons, the Court concludes that KRS § 342.375 applies to conventional full coverage workers' compensation insurance policies, not to the specialized excess insurance requirements under KRS § 342 .350 and its accompanying regulations.

Another necessary premise of Plaintiff's argument is that the regulations require excess coverage for all future claims. However, 803 KAR 25:020, *et seq.*, as written and interpreted in 1987, requires only aggregate excess insurance for claims in the current year, not for claims in future years. The regulations focus solely upon the trustees' obligation to cover expected and potential excess liabilities for the

forthcoming year.[15] Neither the "loss fund" nor the aggregate excess definition discuss or mention future claim liability beyond the coming year. Each year, the trustees must re-estimate expected claims for the coming year. This requirement protects workers each year the fund operates. That retained liability is defined by the loss fund for the coming year, not all future years, supports this interpretation. This focus is consistent with the regulatory focus on projecting and covering claims as part of annual certification.

A final consideration suggests that conformation of the GenRe Policy would be wrong. The regulations impose specific obligations upon self-insured groups, not upon insurance companies. Certainly, GenRe would have liability to KACo–KML if it promised a policy to meet the regulatory requirements. The Court does not know what conversations occurred between KACo–KML and GenRe and these motions do not concern those interactions. However, this Court cannot find and KACo–KML does not provide any authority for conforming an insurance policy for the benefit of self-insured fund trustees who may have failed to meet the obligations Kentucky law imposed upon them. Nor has the Court located any authority for conforming an insurance policy to meet the broad purposes of regulations imposing duties upon KACo–KML.

 In Kentucky, conformation is a remedy intended to prevent insurance companies from taking advantage of unsophisticated consumers by writing and selling policies under which insureds unwittingly surrender their statutory rights. Kentucky courts have typically applied the remedy in cases of direct conflict between the statute and the policy. For reasons the Court has discussed, ours is not such a case. That KACo–KML bought an insurance policy which failed to fulfill the broad purposes of Kentucky law does not mean that GenRe issued a policy directly conflicting with Kentucky law. Absent such a finding it is inappropriate under Kentucky law to conform the GenRe Policy to provide claims incurred coverage. To do so would require a significant expansion of Kentucky's conformation remedy. The Court sees neither legal basis nor equitable reason for doing so.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

Having considered the parties' cross-motions for partial summary judgment and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff's motion for partial summary judgment to conform the Policy is DENIED. Defendant's cross-motion for partial summary judgment is SUSTAINED and Count I of the complaint is DISMISSED WITH PREJUDICE.

---

**15.** Should the group ever decide to disband or discontinue coverage, the regulations give the board authority to require additional protections and coverage for future claims, if necessary. 803 KAR 25:020 § 4.